JOHN J. MULLIGAN, Respondent, v. THE NEW YORK AND ROCKAWAY BEACH RAILWAY COMPANY, Appellant.

While a common carrier of passengers, by his contract of transportation, undertakes to protect the passenger against any injury arising from the negligence or willful misconduct of its servants when engaged in the performance of their duties, to warrant a recovery of damages alleged to have been caused by a breach of the undertaking, the negligence or willful misconduct must not only be shown, but it must also appear that the servant was acting at the time in the course of his employment. (EARL and FINCH, JJ., dissenting.)

In an action to recover damages for an alleged unlawful arrest and imprisonment, the following facts appeared: Plaintiff, accompanied by a friend, purchased two passenger tickets of defendant's ticket agent, to whom he gave a five dollar bill and received the change with the tickets. A short time before a detective had left with said agent a circular describing three men who, it stated, were engaged in passing counterfeit five dollar bills; the detective told said agent to look out for these men, and if they appeared, to have them arrested. The agent took the bill of plaintiff, supposing him and his companion to be two of the men, and that the bill was counterfeit. After testing it, he sent word to a detective. In consequence of this, a police officer came; the agent, according to the plaintiff's testimony, pointed out the plaintiff, who was sitting at the time outside the station, and directed his arrest; he was thereupon arrested and brought into the ticket office. The agent charged him with having passed a counterfeit bill, which plaintiff denied, but gave the agent another bill in its place. He was then taken to the police court, and, upon examination, was discharged, the first bill having been found to be good. *Held* (EARL and FINCH, JJ., dissenting), that defendant was not liable; that the agent was not acting in the line of his duty so as to make his principal responsible for his acts; that he took the bill supposing it to be counterfeit, and so not in the course of his business, or in the discharge of his duties as agent, but to entrap plaintiff and to aid the police; and that he was not engaged in the discharge of any duty as agent when he pointed out plaintiff and directed his arrest; also, that defendant was not liable to plaintiff for any breach of its contract with him as a passenger, or for neglect of any duty growing out of the relation of passenger and carrier.

(Submitted December 7, 1891; decided January 20, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made May 11, 1891, which affirmed a judgment in favor of plaintiff entered upon a verdict and affirmed an order denying a motion for a new trial.

This action was brought to recover damages for an alleged unlawful arrest and imprisonment.

The facts, so far as material, are stated in the opinion.

*E. B. Hinsdale* for appellant. The defendant is not liable for the agent's mistaken view of his duty as a citizen. (Laws of 1888, chap. 583, §§ 20, 25 ; Code Crim. Pro. § 83 ; Penal Code, § 223.)

*Chas. J. Patterson* for respondent. The plaintiff, having purchased a ticket and passed upon the defendant's platform to wait for the train, had become a passenger, and as such was entitled to be protected against unlawful injuries from defendant's employes. (*Carpenter* v. *B. & A. R. R. Co.*, 97 N. Y. 494; *Stewart* v. *B. C. T. R. R. Co.*, 90 id. 588; *Mallach* v. *Ridley*, 6 N. Y. S. R. 651; *Lynch* v. *M. E. R. R. Co.*, 90 N. Y. 75; *Hamel* v. *N. Y. & B. F. Co.*, 6 N. Y. Supp. 102.) The ticket agent was acting within the scope of his authority in directing the arrest. (*Rounds* v. *D., L. & W. R. R. Co.*, 64 N. Y. 129.) The arrest was unlawful. (Code Crim. Pro. §§ 177, 183.) An objection taken after a witness answers is not available for any purpose, and an exception based on such an objection is useless on appeal. (*Parsons* v. *N. Y. C. & H. R. R. R. Co.*, 113 N. Y. 355; *Hangen* v. *Hachmeister*, 114 id. 566; *Platner* v. *Platner*, 78 id. 102.) The damages awarded were not excessive. (*McGibbon* v. *Young*, 20 Wkly. Dig. 12; *Lynch* v. *M. E. R. R. Co.*, 90 N. Y. 77; *Monjo* v. *Monjo*, 6 N. Y. Supp. 132; 8 id. 855.)

O'BRIEN, J. The plaintiff recovered damages in this case upon an allegation that he was unlawfully arrested and imprisoned by the defendant. The legal question involved relates to the responsibility of the defendant for the conduct of a ticket agent under the following circumstances: On the 10th of July, 1888, the plaintiff and a companion went to the defendant's station at the corner of Atlantic avenue and Vesta street, Brooklyn, and procured from the ticket agent there two excursion tickets to Rockaway Beach. The plaintiff handed to the agent a new five dollar bill in payment for the tickets and received from him the tickets and the change. A very short time before the plaintiff and his friend appeared at the station and purchased the ticket a detective connected with the Brooklyn police force came to the station and left with the agent the following paper:

"Look out for three men passing $5 counterfeit bills, Garfield picture. One 35 years, blue coat, black slouch hat, small

dark mustache.    One 40 years, dark alapaca coat, black pants, slouch hat; the other 35 years, blue suit, black slouch hat, full red whiskers, looks like Italian."    When the plaintiff and his companion came to the station the ticket agent supposed they were two of the parties described in the notice left with him by the detective.    The agent's statement as to what took place between himself and the detective before the plaintiff appeared at the station and his action in consequence down to the time of the arrest is not contradicted.    The agent was told by the detective that if any of these men referred to in the paper put in an appearance to have the officers arrest them. He says that the two men walked up to the window of the ticket office and the plaintiff took a brand new five dollar bill from his pocket and asked for two tickets for Rockaway Beach and return.    What the agent then did is perhaps best expressed in his own language.

He says : " I took the money from him and gave him the two tickets; didn't let on anything at the time ; took the bill and left it one side, because it looked ' queer.'    After the two went outside a messenger boy came in ; I took the bill up before the messenger came ; took a pin and pulled to find the two parallel silk threads that run through the bill, it appears, in all these kind of bills that are made with the distributor fibre through, it is like a pencil mark, red and blue, and when I picked at it I could not see anything in it, and as I have no instructions to arrest anybody, I took the bill and when the messenger boy came in I told him to take the bill, go up to the Howard House and see if he could find Detective McNeany.    If he did, to give him the bill and tell him that the men who had the bill were here at the station.    I told him that if he didn't find him to give it to the ticket agent at the Howard House, the detective said something about giving him the bill and to ask him if that was the bill.    I sent the bill away by this boy, the same bill that I received.    Afterwards Officer Kenney and the messenger boy came in.    The bill was not returned to me.    I never had the bill after I gave it to the messenger boy."

It seems that in consequence of the action of the agent that the police arrived in a short time after the ticket had been purchased and while the plaintiff and his companion were sitting on a bench outside and as the plaintiff claims the agent pointed him out to the police and directed them to arrest him.

He was arrested and brought to the police court, when it appearing that the bill was good he was discharged. The transaction immediately preceding the arrest is thus described by the plaintiff:

" I went in and handed him in a five dollar bill to the ticket agent, asked him for two return tickets for Rockaway; he took the bill and looked at me; I thought that it was some young man that might have known me, he was going so slow, going to make the change and give me the tickets; and walked back in the rear of the office, there was an operator, a lady sitting there; he had some conversation with her and in another corner was a boy, in another corner of the room; he came back to me and looked at me again, I says, you ought to be in a little more hurry than that, he didn't say a word but handed me out the change and my return tickets — the change of the five dollar bill, which I think was four thirty, or whatever it was. Then we walked out on the platform, down on the Atlantic Avenue side and sat on the bench of the station platform for ten or fifteen minutes, waiting for the train to come up. It is a regular platform, I think there is a porch over it. I did not have to pass through a gate to go to it."

After the plaintiff was pointed out to the police by the agent, he was brought into the ticket office, and the agent then charged him with having passed to him a five dollar counterfeit bill, which the plaintiff denied, but gave to the agent another bill in its place. The agent denied that he gave any direction to the police to make the arrest, and there was some question on the trial as to whether the bill that was actually passed by the plaintiff was the bill produced before the police magistrate, and found by him to be good, but these questions must be regarded as settled in the plaintiff's favor by the verdict of the jury.

Assuming, as we must, that the agent directed the arrest, and that the plaintiff had committed no offense that justified it, the question still remains whether the agent was acting in the line of his duty, so as to make the defendant responsible for his acts. It is quite clear from the evidence that the agent was first put upon his guard and in fact set in motion, not by any direction from the defendant, but by the police. When he took the bill he knew, or at least believed it to be a counterfeit, but notwithstanding this, he gave the plaintiff defendant's property for it, whereas it was his duty, considering him merely as the agent of the defendant, to refuse it. He did not take the bill in the course of his business as agent, but for the purpose of entrapping persons that he believed to be engaged in the commission of crime. This may have been laudable enough on his part as a citizen, or as a person aiding the police, but he was not acting in the line of his duty as defendant's agent. If he had been cheated or imposed upon by the plaintiff, or if he honestly believed he had been, and then attempted to recover what he had, or supposed he had, lost by the arrest of the plaintiff, it might then be said that he was engaged in the protection of the property and interest of the defendant, and, therefore, acting within the line of his duty. But here a ticket agent of a railroad deliberately takes from a person, applying to purchase a ticket, what he believes to be a counterfeit five dollar bill, not, of course, in good faith, or in the regular and ordinary course of his business, but for the purpose of aiding the police in the detection of criminals, and then immediately directs the arrest of the person from whom he took the bill, such an act on his part is not binding on his principal. If he was in fact acting within the scope, and in the line, of his duty, he would have refused to receive what he believed to be counterfeit money for the property of his principal, and would have refused to part with such property, except upon receipt of what, at least, he believed to be good money. The defendant, as a citizen, might with perfect propriety render to the police such services as he could in procuring the detection and arrest of persons engaged in passing

counterfeit money, but it does not follow that all his acts in that respect are binding on the defendant. The charge, therefore, that the defendant procured the plaintiff to be arrested without cause, was not made out, as the act of the ticket agent in this respect cannot be attributed to them.

The remaining question is whether it was shown that the defendant is liable for a breach of its contract with the plaintiff as a passenger, or for neglect of any duty it owed to him, growing out of the relation of passenger and carrier. The law is settled that a common carrier, by its contract of transportation, undertakes to protect the passenger against any injury arising from the negligence or willful misconduct of its servants while engaged in performing a duty which the carrier owes to him. (*Stewart* v. *B. & O. R. R. Co.*, 90 N. Y. 588.)

Upon the facts disclosed by the record, it is very difficult to bring this case within that principle. All we know with respect to the duties of the agent is that he sold tickets at the station from a place behind a window in the waiting-room. It does not appear that he had any charge of the place where the plaintiff was when arrested, or that the plaintiff was, within the meaning of the decisions, in his custody or under his protection, or that the ticket agent was entrusted by the defendant with any powers or duties with respect to the execution of contracts for the transportation of passengers. Upon the facts disclosed at the trial, it would be quite difficult, if not impossible, to classify the act of the agent, in pointing out the plaintiff to the police and directing his arrest, as negligence or willful misconduct. There can be no doubt that a conductor, or like agent of a carrier of passengers, who has them in his charge and under his care, may violate the duty which he owes to them by directing an arrest without cause, for which his principal may be held liable, but sufficient was not shown in this case to bring it within that rule.

The judgment should be reversed and a new trial granted, costs to abide the event.

EARL, J. (dissenting). The plaintiff purchased of the defendant's agent at East New York two tickets for himself and friend to Rockaway Beach and back, over its railway, and immediately passed out of the depot building on to the platform outside, where he took a seat, under an awning, upon a bench provided for passengers who were awaiting trains. By the purchase of these tickets the relation of carrier and passenger was created between him and it, its agreement implied from the facts being that it would, upon its first train stopping at that station, carry him to his destination. The train was soon expected, and while he was there waiting for it he was entitled to a safe place to stand or sit, and it was under obligation to him that he should not be injured by the careless or willful misconduct of any of its employes or agents. (*Carpenter* v. *Boston & Albany R. R. Co.*, 97 N. Y. 494.) In that case, after the plaintiff had purchased his ticket for a passage on the defendant's road, and while he was standing on the platform at the depot, a postal clerk threw a mail bag from the train, which struck and injured him; and DANFORTH, J., writing the opinion, said: "The plaintiff was injured before the actual commencement of his journey, but he was lawfully on the platform because he was a passenger;" and it was held that it is the duty of a railroad corporation to provide for a passenger a safe passage to the train he desires to take, and to take reasonable care that he shall not while on its premises be exposed to any unnecessary danger, or to one of which it is aware; that it is bound to exercise the utmost vigilance, not only in guarding its passengers against careless interference by others, but even against violence, and if in consequence of neglecting this duty a passenger receives injury which, in view of all the circumstances, might have been reasonably anticipated, it is liable.

No one will question that if the plaintiff, while sitting upon the bench waiting for the train, had been injured by the carelessness of one of the defendant's employes, it would have been liable; and it is now well settled that where a railroad company would be liable for the careless act of its employe, it would also be liable for his willful or malicious act, causing

injury to a passenger whom it was bound to keep and carry safely. In *White* v. *23d St. R. R. Co.* (20 N. Y. Wkly. Dig. 510), it was held that if a passenger on a street railway is ejected from the car and assaulted by the driver, when the fare has been put in the box, the company is liable, and also for causing the arrest of the passenger. In *Hamel* v. *N. Y. & B. Ferry Co.* (6 N. Y. Sup. 102, affirmed in this court, 125 N. Y. 707), the action was for assault and battery and false imprisonment, and it was held that the court correctly charged that if the defendant's employe unjustifiably assaulted the plaintiff while and because he attempted to pass through a gate which the employe was in charge of, and, as part of the same transaction and assuming to act under the defendent's authority, called in a police officer and had the plaintiff arrested, defendant was liable, and that it was immaterial whether it authorized the arrest or not. In *Stewart* v. *Brooklyn & Crosstown R. R. Co.* (90 N. Y. 588), where the plaintiff was a passenger on one of the defendant's street cars, and was unjustifiably assaulted and beaten by the driver, it was held, in an action to recover damages therefor, that it was liable; that the rule relieving a master from liability for a malicious injury inflicted by his servant, when not acting within the scope of his employment, does not apply as between a common carrier of passengers and a passenger; that such a carrier undertakes to protect the passenger against any injury arising from the negligence or willful misconduct of its servants while engaged in performing a duty which the carrier owes to the passenger. In that case Judge TRACY writing the opinion of the court cited many authorities; and among other things said: " In the present case the defendant had intrusted the execution of the contract to the driver of the car, and the plaintiff was under his protection. Any breach of the contract committed by the driver, was a breach committed by the defendant. It is conceded that any injury arising from the mere negligence of the servant constitutes a breach of the contract. Had the driver while executing the contract, carelessly and negligently injured the plaintiff, the defendant's liability would not have

been doubted. Can it be less a breach of the contract that the injury was intentionally inflicted? An act which would amount to a breach of the carrier's contract, if negligently done, would be equally a breach if done willfully and maliciously. It is immaterial whether a breach of contract results from negligence or willfulness of the defendant's agent. It is the injury that was suffered by the plaintiff while in the defendant's car, and not the motive which induced it, that constitutes the gist of the action. No reason exists for holding a master liable for the negligence of servants in his employment which does not with equal force preclude him from alleging intentional default of the servant as an excuse for not performing a duty which he has undertaken. In the former case the negligence of the servant is that of the master, and that is the ground of the master's liability; in the latter the act of the servant is the act of the master, the motive of the servant making no difference in regard to the legal character of the master's default in doing his duty, * * *. A rule which should make the carrier liable when the act resulting in the injury was carelessly, but unintentionally done, and exonerate him when the injury was the result of the intentional act of the servant, would lead to most absurd results." In *Dwinelle* v. *N. Y. C. & H. R. R. R. Co.*, (120 N. Y. 122,) it was held that a railroad company by the sale of a ticket for passage on its road, assumes the obligation, and undertakes absolutely to protect the passenger against any injury from negligence or willful misconduct of its servants while performing its contract; and that whatever may be the motive which incites the servant to commit an unlawful or improper act towards the passenger during the existence of the relation of carrier and passenger, the carrier is liable for the act and its natural and legitimate consequences. In such a case, too, it has been held that it is wholly immaterial upon the question of the defendant's liability that the servants acted in good faith. (*Hamilton* v. *T. A. R. R. Co.*, 53 N. Y. 25.)

In this case the relation of carrier and passenger having been created by the purchase of the tickets, the plaintiff was just

as much entitled to protection against the wrongful acts of the defendant's servants as if at the time of the assault upon him and his arrest he had been in one of its cars. He was in a place where he had a right to be, and where under the rules of law announced in the cases cited he was entitled to protection against injury from the negligent or willful acts of its servants.

It is immaterial what the ticket agent's motive may have been. He may have been prompted by the desire to do a public service by the arrest of criminals, or by a malicious motive, simply to do the plaintiff an injury; and still, under the authorities cited, the defendant was liable for his acts. Suppose, instead of directing the police officer to arrest the plaintiff, he himself had seized and confined him in the depot, would any one then contend that the defendant would not be liable? And can it be said that that case would have been any different in principle from this? Suppose, instead of directing the police officer to arrest him, he himself had made the arrest, and dragged the plaintiff through the streets to the police station; can it be doubted that the defendant would have been liable? The law makes it liable in such cases simply because of the unlawful interference with the person of the plaintiff, a passenger, by one of its employes, and the motive of the employe is entirely immaterial upon the question of its liability. The motive may operate upon the question of damages, but cannot wholly shield the defendant against liability. The agent not only caused the arrest, but, in violation of the duty which the defendant owed the plaintiff growing out of the sale of the tickets and the contract thus made to carry him to his destination, he broke the contract by rendering it impossible that the plaintiff could be carried. Instead of going upon the train, as he had the right to do under his contract, by the act of its agent, he was taken to a police station and kept under arrest for an hour or more. Can a ticket agent sell tickets to a passenger and then arrest him, or cause him to be arrested, so that he cannot take passage upon the train for which he has purchased a ticket, and the railroad company escape all responsibility for his acts?

If the plaintiff had been a mere lounger in or about the defendant's depot, having no relations with it — not a passenger — different rules of law would apply, and it may well be that upon the facts as they appear, it would not have been liable for the assault upon him and his arrest. Its liability to him grows out of the fact that he was a passenger entitled to its protection.

No question was made upon the trial as to the extent of the ticket agent's authority. It was there assumed that he was the agent having the charge of the depot at East New York. It does not appear that there was any other agent at that point. He is spoken of in the evidence as *the* agent. The general superintendent of the defendant's road testified that he was "the agent" of the defendant at East New York, and in the motion by the defendant's counsel for a nonsuit, he was spoken of as "the agent" of the defendant. The judge, in his charge to the jury, spoke of him as "the ticket agent in charge of this station," and no exception whatever was taken to this remark, and no claim whatever was there made by the defendant that he was not its agent in charge of that depot.

We, therefore, see no reason to doubt that the judgment in favor of the plaintiff is right, and should be affirmed, with costs.

All concur with O'BRIEN, J., except EARL, J., who reads dissenting opinion, and FINCH, J., concurring.

Judgment reversed.